[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a civil action, returnable to the Judicial District of New Haven, claiming damages for conversion and embezzlement and breach of fiduciary duty of the plaintiffs' funds. This action is brought by the plaintiff, individually and on behalf of her minor child, Rebecca Anne Price, born October 20, 1975, and is further brought individually by the plaintiff's daughter, Jennifer Lynn Price, born August 1970. The defendant is the husband of the named plaintiff (hereinafter referred to as the plaintiff), Pamela B. Price, and the father of the Rebecca Anne Price and Jennifer Lynn Price.
This action has been consolidated with a dissolution of marriage action between the named plaintiff and the named defendant, returnable to the Judicial District of New Haven, Docket No. 299109.
The original action was commenced by an eleven-count complaint dated August 24, 1989, and returnable on September 19, 1989. There are amendments to the complaint with the most recent request for leave to file amended complaint being dated April 7, 1992, and file stamped April 13, 1992. That request for leave to file amended complaint was granted without objection and added Counts XII and XIII.
The present amended complaint is in thirteen counts, pleading the following causes of action:
 Count I: Conversion action by Pamela B. Price alleging that the Defendant, through the use of a power of attorney, sold stocks, endorsed and deposited checks CT Page 4629 payable to the Plaintiff into his own account, withdrew funds from the Plaintiff's bank account and spent or used those funds converted for his own sole benefit.
 Count II: Alleges the creation of a fiduciary relationship between Pamela Price and the Defendant by virtue of the granting of the power of attorney and a breach of that duty in the manner described in Count I.
 Count III: Alleges the facts recited in Counts I and II as supporting a claim of embezzlement in violation of C.G.S. 53a-119 (1). (The plaintiff seeks treble damages under this count in accordance with 52-564.)
 Count IV: Alleges that the Defendant made fraudulent representations to induce Pamela Price to execute documents transferring her real and personal property.
 Count V: Alleges the commission of forgeries by the Defendant. (The plaintiff seeks double damages under this count in accordance with 52-565.)
 Count VI: Pamela Price, as parent and next friend of Rebecca Anne Price, alleges conversion of the proceeds from the sale of certain securities to the defendant's own use and possession.
 Count VII: Pamela Price, as parent and next friend of Rebecca Anne Price, alleges that the defendant invested the proceeds claimed to have been converted in a business thereby entitling the Plaintiff to an interest in the business. (The plaintiff seeks double damages under this count in accordance with 52-565.)
 Count VIII: Pamela Price, as parent and next friend of Rebecca Anne Price, alleges that those acts recited in Count VI constitute embezzlement. (The plaintiff seeks triple damages under this count in accordance with 52-564.)
 Counts IX through XI: Jennifer Lynn Price, in her own right, alleges the identical facts asserted in Counts VI through VIII and claims the same relief. (The plaintiff seeks double damages under Count X in accordance with 52-565 and triple damages under Count CT Page 4630 XI in accordance with 52-564.)
 Count XII: Pamela Price, only, alleges that the Defendant, by agreement held and managed the Plaintiff's financial affairs exclusively, including the accounts of her children, that the Defendant acted in a fiduciary capacity towards the Plaintiff, Pamela B. Price, that the Defendant made false representations for the purpose of keeping the plaintiff from knowing the actual status of her accounts and that the Defendant's acts constituted fraud.
 Count XIII: Pamela Price, only, alleges, by reason of a continuing course of tortious conduct, that the Defendant negligently breached this fiduciary duty to the Plaintiff and her children.
The plaintiff also seeks punitive damages including costs and expenses of litigation as to all counts.
The court finds that there is no evidence regarding forgeries by the defendant and, therefore, finds in favor of the defendant regarding Count V.
The court makes the following findings of fact. The parties were married in 1967. In approximately 1976 the plaintiff received from the estate of her mother approximately $250,000.00 in stocks and bonds. Part of that money was invested in the plaintiff's name for the benefit of the two children named in this suit. The defendant offered to handle all of the financial affairs for the plaintiff and the two children. This would include the handling of the sale and reinvestment of the stocks. The plaintiff and the defendant agreed that the proceeds from the sale and reinvestment of any of the stocks were to be kept in a separate account in the name of the plaintiff and in the name of the plaintiff for the benefit of the children. The defendant had a Master's Degree in Business Administration and was interested in stock market investments. The defendant subscribed to numerous stock magazines. He promised the plaintiff that he would manage the stock portfolio and that she would be kept aware of what was being done with the stocks. The plaintiff totally relied on the advice given to her by the defendant. The defendant assured the plaintiff that the stocks were growing in value. The defendant handled the sale and repurchase of stocks with the stock broker, H. M. Payson Co., exclusively. Over the CT Page 4631 years the defendant would tell the plaintiff that stocks were increasing in value and doing well. The plaintiff believed that the defendant had the ability to handle the purchase and sales of her stock portfolio as well as that of the two girls and relied totally on his representations. She believed that the defendant would protect not only her stock fund, but also the stock funds of the two girls. The defendant had a NOW account at Connecticut Bank and Trust and also had an account at First Citizens Bank, Ashville, North Carolina. The parties also had a joint account at First Federal regarding their home equity loan. The NOW account at Connecticut Bank and Trust and the account at First Citizens Bank were both in the defendant's name only.
The defendant received the following sums of money by check from his mother, Virgina S. Price:
DATE AMOUNT
 December 5, 1985 $10,000.00 February 1, 1986 $10,000.00 November 9, 1987 $ 1,500.00 February 8, 1988 $ 5,000.00 July 14, 1988 $ 1,200.00 December 9, 1988 $ 200.00 January 28, 1989 $ 200.00
The defendant formed a corporation by the name of Alamap in approximately 1985. The parties obtained a home equity loan in the amount of $75,000.00 to be used to fund that corporation. that loan is in both the plaintiff's and the defendant's name. Part of the monies that the defendant received from his mother was transferred into the Alamap bank account. Part of the money was used for family living expenses. Between 1985 and 1988 the defendant was unemployed except for a job that he held for a few months at Pepperidge Farms. In the calendar year 1987 the gross income for both the plaintiff and the defendant was $9,862.00. The plaintiff was employed between 1985 and 1988 for various boards of education and also had a part time job working in a restaurant. She earned approximately $10,000.00 in 1986.
The claims of the plaintiffs fall into the following four general categories:
 (1) The Payson checks payable to plaintiff individually: $68,271.30. CT Page 4632
 (2) The Payson checks payable to the plaintiff as trustee for the minor children: $21,270.00.
 (3) The sale/purchase of Rhode Island/Madison, Connecticut house: $71,607.54.
 (4) Sums withdrawn from plaintiff's Connecticut Bank and Trust account without the plaintiff's authorization or knowledge: $46,505.00.
These four claims will be considered seriatim:
 (1) The plaintiff's claim regarding Payson checks payable to plaintiff individually: $68,271.30.
The court makes the following additional findings of fact regarding this claim: On February 3, 1986 a check was issued by the H. M. Payson Company payable to the order of the plaintiff in the amount of $24,471.80. The defendant deposited that check into his individual CBT account on February 7, 1986. On April 9, 1986 a check was issued by the H. M. Payson Company payable to the order of the plaintiff in the amount of $23,914.04. The defendant deposited that check into his CBT account on April 14, 1986. On January 18, 1987 a check was issued by the H. M. Payson Company payable to the order of the plaintiff in the amount of $19,885.46. The defendant deposited that check into his CBT account on February 2, 1987. The above three checks total $68,271.30.
The defendant has accounted for the following purchases that he made on behalf of the plaintiff:
DATE AMOUNT TYPE OF PURCHASE
 February 11, 1986 $ 4,436.00 200 Shares Gerber Stock February 11, 1986 $ 2,835.60 100 Shares Lomis Nettleton Stock June 3, 1986 $ 4,000.00 Bond June 12, 1987 $ 7,757.23 125 Shares CitiCorp July 8, 1987 $ 5,680.96 200 Shares ServiceMaster July 8, 1987 $ 5,546.60 60 Shares Philip Morris
These total $30,256.39. Those shares of stock and the bond have not been resold by the defendant. CT Page 4633
The difference between the $68,271.30 of Payson funds deposited by the defendant into his own account and the amount of stocks and bonds that he purchased on behalf of the plaintiff with the plaintiff's funds of $30,256.39, amounts to $38,014.91.
 (2) The plaintiff's claim regarding Payson checks payable to her as trustee for the two children: $21,270.00.
The court makes the following findings of fact regarding this claim: The reason for having funds for the two girls was to provide for their college education. The defendant had told the plaintiff that he would manage those funds with the plaintiff as custodian. He told her that the funds for the two girls would each be kept separate in the plaintiff's name. In the Fall of 1988 the plaintiff discovered that the defendant had an account in his name for the two girls. She did not have any prior knowledge of that. The defendant agreed with the plaintiff that stock would be put in the names of each of the two girls, with the plaintiff as custodian. All stocks purchased for either of the girls were to also have the plaintiff's name on as custodian.
A. Jennifer L. Price
On March 16, 1988 the H. M. Payson Company issued a check payable to the order of the plaintiff as custodian for her daughter Jennifer L. Price, in the amount of $9,116.39. The defendant deposited that check on March 18, 1988 into an account in CBT that he had opened in his name as trustee for Jennifer L. Price. On April 9, 1986 the H. M. Payson Company issued a check payable to the order of the plaintiff as custodian for Jennifer L. Price in the amount of $7,943.11. The defendant deposited that check on April 14, 1986 into the CBT account he opened as trustee for his daughter, Jennifer L. Price. On May 20, 1986, the H. M. Payson Company issued a check payable to the order of the plaintiff as custodian for Jennifer L. Price in the amount of $926.84. On May 22, 1986, the defendant deposited that check into the CBT account he opened as trustee for his daughter Jennifer Price. The final check issued by H. M. Payson Company, payable to the order of the plaintiff as custodian for Jennifer Price, was in the amount of $668.15. That check was deposited by the defendant on December 31, 1986 into the CBT trustee account that he opened for his daughter. The total for the four Payson checks issued to the plaintiff as custodian, that were deposited by the defendant in his CBT account as trustee for CT Page 4634 Jennifer L. Price, amounts to $18,654.49. In addition, the defendant deposited into that account the sum of $3,360.24 on July 23, 1986. No evidence was presented as to where the $3,360.24 came from. The plaintiff never authorized the defendant to set up an account for Jennifer with himself as trustee. She did not know there was such a bank account until approximately September 1988. She did not know that the stock sale proceeds were going into that account under the defendant's name. Between 1985 and 1988 whenever the plaintiff inquired of the defendant regarding Jennifer's college fund, she was sold by him that it was making money and doing well. The defendant told the plaintiff that the college fund for both Jennifer and Rebecca were each in excess of $20,000.00. The plaintiff believed the defendant and relied on him. It was not until the Fall of 1988 that she learned of the CBT bank account that the defendant held is trustee for Jennifer, as well as the CBT bank account that he held as trustee for Rebecca. She closed the account in Jennifer's name on September 13, 1988 and withdrew the balance of $56.00. The defendant made the following withdrawals from Jennifer L. Price's CBT trustee account in 1988.
 February 5, 1988 $ 715.00 On February 5, 1988 the defendant deposited the $715.00 withdrawn from Jennifer's account into his Alamap corporate account.
 March 9, 1988 $ 405.00 On March 9, 1988 the defendant deposited the $405.00 withdrawn from Jennifer's account into his personal checking account at CBT.
 March 22, 1988 $ 535.00 On March 22, 1988 the defendant deposited the $535.00 withdrawn from Jennifer's account into his Alamap corporate account.
 March 29, 1988 $ 625.00 On March 29, 1988 the defendant deposited the $625.00 withdrawn from Jennifer's account into his personal checking account at CBT. April 5, 1988 $ 1,585.00 CT Page 4635
 The defendant deposited the $1,585.00 withdrawn from Jennifer's trustee account into his Almap corporate account.
 April 13, 1988 $ 2,250.00 On April 13, 1988 the defendant deposited the $2,250.00 withdrawn from Jennifer's account into his personal checking account at CBT.
 April 14, 1988 $ 255.00 The defendant withdrew the $255.00 withdrawn from Jennifer's trustee account into his Alamap corporate account.
 April 15, 1988 $ 3,375.00 On April 15, 1988, the defendant deposited the $3,375.00 withdrawn from Jennifer's account into his personal checking account at CBT.
 June 3, 1988 $ 865.00 The defendant deposited the $865.00 withdrawn from Jennifer's trustee account into his Alamap corporate account on June 3, 1988.
August 5, 1988 $ 600.00
September 13, 1988 $ 60.00
The total amount of withdrawals by the defendant from Jennifer Price's account, of which he was trustee, in 1988, was $11,270.00, consisting of $3,955.00 deposited to Alamap, $6,655.00 deposited to the defendant's personal account, and $660.00 unknown. Of the total Payson checks that were issued to the plaintiff as custodian for Jennifer, and deposited by the defendant into his CBT account, totaling $18,654.49, the defendant has accounted for $6,100.00 of that amount having been expended on Jennifer's behalf for her college education and expenses and an additional $3,000.00 having been purchased for bonds for Jennifer that have not been cashed. When the $9,100.00 is deducted from the $18,654.49, it leaves $9,554.49 of Jennifer's funds that have been retained by the defendant CT Page 4636 individually or on behalf of Alamap.
B. Rebecca A. Price
On April 9, 1986 a check was issued by H. M. Payson Co., payable to the order of Pamela B. Price, custodian for Rebecca A. Price, in the amount of $7,943.11. That check was deposited by he defendant on April 14, 1986 into a trustee account that he set up at CBT in his own name as trustee for Rebecca A. Price.
On December 29, 1986 a check was issued by H. M. Payson Co., payable to the order of Pamela B. Price as custodian for Rebecca A. Price, in the amount of $668.15. That check was deposited by the defendant into his trustee account for Rebecca A. Price at CBT on December 31, 1986.
On April 25, 1988, a check was issued by H. M. Payson Co., payable to the order of Pamela B. Price as custodian for Rebecca Price, in the amount of $7,883.94. That check was deposited by the defendant into his CBT trustee account on April 27, 1988.
A check was issued by H. M. Payson Co., payable to the order of Pamela B. Price as custodian for Rebecca A. Price, on June 8, 1988, in the amount of $1,435.34. That check was deposited by the defendant in his trustee account for Rebecca A. Price on June 10, 1988.
The total of the four Payson checks issued to the plaintiff as custodian that were deposited by the defendant in his CBT account as trustee for Rebecca A. Price amounts to $17,930.54.
The following is a list of withdrawals made by the defendant from the trustee account that he set up at CBT as trustee for Rebecca A. Price in 1988.
March 15, 1988 $ 1,785.00
 April 21, 1988 $ 845.00 On April 21, 1988 the defendant deposited the $845.00 withdrawn from Rebecca's account into his Alamap corporate account.
 April 29, 1988 $ 335.00 On April 29, 1988 the defendant deposited CT Page 4637 the $335.00 withdrawn from Rebecca's account into his Alamap corporate checking account.
May 3, 1988 $ 1,905.00
May 10, 1988 $ 1,045.00
 May 13, 1988 $ 2,295.00 The $2,295.00 withdrawn from Rebecca's trustee account by the defendant was deposited into his personal CBT account on May 13, 1988.
 May 25, 1988 $ 305.00 The $305.00 withdrawn from Rebecca's trustee account by the defendant was deposited into his personal checking account on May 25, 1988.
May 27, 1988 $ 1,605.00
 June 3, 1988 $ 185.00 The $185.00 withdrawn from Rebecca's trustee account by the defendant was deposited into his personal checking account on June 3, 1988.
 July 6, 1988 $ 875.00 On July 7, 1988 the defendant deposited the $875.00 withdrawn from Rebecca's trustee account into his Alamap checking account.
 July 15, 1988 $ 250.00 On August 1, 1988 the defendant deposited the $250.00 withdrawn from Rebecca's trustee account into his Alamap checking account.
 July 18, 1988 $ 575.00 The $575.00 withdrawn from Rebecca's trustee account by the defendant was deposited into his personal checking account on July 18, 1988. CT Page 4638
August 5, 1988 $ 125.00
September 13, 1988 $ 20.00
The total amount of withdrawals by the defendant from Rebecca Price's account, of which he was trustee, in 1988, was $12,150.00 consisting of $2,305.00 deposited to Alamap, $3,360.00 deposited to the defendant's personal account, and $6,485.00 unknown. Of the total four Payson checks issued to the plaintiff is custodian for Jennifer that were deposited by the defendant into his CBT account totalling $17,930.54, the defendant has accounted for a bond purchased in Rebecca's name in the amount of $3,000.00, leaving $14,930.54 unaccounted for.
 (3) The sale/purchase of Rhode Island/Madison, Connecticut house: $71,607.54.
The court makes the following findings of fact regarding this claim:
The plaintiff and the defendant resided in Rhode Island before purchasing the family home in Madison, Connecticut. The property in fast Greenwich, Rhode Island, was jointly owned by the parties. The plaintiff had invested some of her funds into the Rhode Island property from the inheritance that she received from her mother. She invested slightly over $54,000.00 when the Rhode Island property was purchased. She also paid off from her own funds a $29,901.00 mortgage balance on the Rhode Island property immediately prior to the sale of that property. She paid off the $29,901.00 mortgage on the advice of the defendant, as he stated that the parties would save interest on that mortgage by prepaying it. The parties netted $71,607.54 from the sale of the Rhode Island property. The property was sold in 1983. The plaintiff claims that the defendant took the $71,607.54 and has not accounted for it. The plaintiff never saw he $71,607.54 closing check although she believes she attended he closing. She does not know what the $71,607.54 was used for. It could have been used for family expenses. She does not claim that the defendant used the full $71,607.54 for his own purposes. the defendant denies having converted any of the $71,607.54 funds for his own use and denies having taken that money. He admits to having received the $71,607.54 check from the closing but does not know how the money was spent. He testified that all of the records regarding the $71,607.54 were at the family home in CT Page 4639 Madison, and that the plaintiff has those records.
 (4) The sum withdrawn from plaintiff's Connecticut Bank and Trust account without the plaintiff's authorization or knowledge: $46,505.00.
The court makes the following findings of fact regarding this claim: Between 1985 and 1988 the plaintiff had a money market savings account in her own name at CBT. The agreement between the plaintiff and the defendant was that the defendant was to deposit money into that account from the sale of the plaintiff's stocks and bonds. The plaintiff did not authorize the defendant to withdraw any sums of money from that account. A number of exhibits introduced by the plaintiff regarding her personal money market savings account indicate withdrawals with notations in the defendant's handwriting that either say "TA" "PBP" or "JTP". The court finds that the notation of "TA" refers of a withdrawal with the money having been transferred to the Almap account. The court finds that a withdrawal with a notation of "JTP" is a withdrawal in which the defendant retained the funds. The court finds that a withdrawal with a notation of "PBP" was a withdrawal made at the request of the plaintiff with the plaintiff having received the funds.
 DATE OF WITHDRAWAL AMOUNT TO WHOM TRANSFERRED
 June 1, 1987 $1,450.00 TA The defendant deposited that withdrawal into his Alamap checking account on June 1, 1987.
 June 2, 1987 $ 650.00 TA The defendant deposited that withdrawal into his Alamap checking account on June 2, 1987.
June 15, 1987 $1,450.00 JTP
 June 24, 1987 $ 400.00 PBP for trip to California
 June 26, 1987 $1,125.00 TA The defendant deposited that withdrawal into his Alamap checking account on June CT Page 4640 26, 1987.
 June 29, 1987 $ 400.00 PBP for trip to California
 July 2, 1987 $1,175.00 TA The defendant deposited that withdrawal into his Alamap checking account on July 2, 1987.
 July 10, 1987 $ 925.00 TA The defendant deposited that withdrawal into his Alamap checking account on July 10, 1987.
July 13, 1987 $ 875.00 TA
July 15, 1987 $ 625.00 TA
 July 17, 1987 $ 825.00 TA The defendant deposited that withdrawal into his Alamap checking account on July 17, 1987.
July 20, 1987 $2,000.00 PBP
 July 27, 1987 $2,275.00 TA The defendant deposited that withdrawal into his Alamap account checking account on July 27, 1987.
 July 30, 1987 $1,125.00 $949.50 of which was TA $175.50 was for taxes
 July 31, 1987 $1,125.00 TA The defendant deposited that withdrawal into Alamap account on July 31, 1987.
 August 3, 1987 $1,380.00 $1,080.00 went to Alamap account on 8/3/87
 August 4, 1987 $ 825.00 TA or JTP The defendant deposited that withdrawal CT Page 4641 into Alamap account on August 4, 1987.
August 12, 1987 $1,010.00 JTP
August 14, 1987 $ 735.00 JTP
August 31, 1987 $ 535.00 JTP
 September 2, 1987 $ 775.00 TA The defendant deposited that withdrawal into Alamap account on September 2, 1987.
September 14, 1987 $1,825.00 JTP
September 18, 1987 $ 260.00 JTP
 September 22, 1987 $ 530.00 TA The defendant deposited that withdrawal into Alamap account on September 22, 1987.
September 23, 1987 $ 245.00 JTP
 September 30, 1987 $ 965.00 TA The defendant deposited that withdrawal into Alamap account on September 30, 1987.
 October 1, 1987 $1,280.00 TA The defendant deposited that withdrawal into Alamap account on October 1, 1987.
 October 2, 1987 $1,240.00 $950.00 of which was TA $230.00 JTP The defendant deposited $950.00 of that withdrawal into Alamap account on October 2, 1987.
 October 8, 1987 $1,125.00 TA The defendant deposited that withdrawal into Alamap account on October 8, 1987.
October 13, 1987 $2,170.00 JTP CT Page 4642
 November 3, 1987 $1,435.00 TA The defendant deposited that withdrawal into Alamap account on November 3, 1987.
November 12, 1987 $2,385.00 JTP
 November 16, 1987 $1,495.00 TA The defendant deposited that withdrawal as part of the deposit into Alamap account on November 16, 1987 of $2,955.00.
November 20, 1987 $ 280.00 JTP
 November 27, 1987 $ 845.00 The defendant deposited $645.00 into Alamap account and $200.00 was retained by defendant.
 December 2, 1987 $ 805.00 $605.00 deposited to Alamap account $200.00 retained by def.
 December 7, 1987 $ 765.00 The defendant deposited that withdrawal into Alamap account on December 7, 1987.
 December 29, 1987 $2,000.00 The defendant deposited that withdrawal into Alamap account on December 29, 1987.
December 12, 1987 $1,855.00 JTP
December 29, 1987 $ 205.00 Yes — to whom?
January 6, 1988 $1,515.00
 January 28, 1988 $1,205.00 The defendant deposited that withdrawal into Alamap account on January 28, 1988.
February 4, 1988 $ 705.00
March 4, 1988 $1,070.00 CT Page 4643
April 12, 1988 $ 40.00
June 20, 1988 $1,125.00
 June 24, 1988 $1,255.00 $605.00 JTP $650.00 TA
July 8, 1988 $ 475.00
July 13, 1988 $ 9,465.63
The total withdrawals marked JTP amount to $13,985.00, the total withdrawals marked PBP amount to $2,800.00, and the total withdrawals marked TA amount to $28,529.50. There is no proof regarding what the purpose of the withdrawals were that have no marking on them. The combined total of sums withdrawn from the plaintiff's account and deposited into both Alamap and the defendant's own account is $42,514.50.
A. THE ISSUE OF CONVERSION
The issue before the court is whether from the facts found here has been a conversion of assets.
In discussing conversion, the court, in Coleman v. Francis,102 Conn. 615, 615-17 (1925), stated in part as follows:
 There are two general classes into which conversions are grouped: (1) those where the possession is originally wrongful, and (2) those where it is rightful. The first class comprises a conversion by a wrongful taking, or by an illegal assumption of ownership, or by an illegal user or misuse, or by any other form of possession wrongfully obtained. The second class comprises those where the possession, originally rightful, becomes wrongful by a wrongful detention. . . .
 The second class is where the possession, originally rightful, becomes wrongful by reason thereafter of a CT Page 4644 wrongful detention, or a wrongful use of the property, or the exercise of an unauthorized dominion over the property.
The court finds in favor of the plaintiffs against the defendant or damages or conversion of assets as follows:
 (1) Payson checks issued to the plaintiff individually in the amount of $68,271.30, less $30,256.39 for a net conversion damage in favor of the plaintiff individually of $38,014.91.
 (2) Payson checks issued to the plaintiff as custodian for Jennifer Price totalling $18,654.49, less $9,100.00 for a net conversion damage in favor of Jennifer Price in the amount of $9,554.49.
 (3) Payson checks issued to the plaintiff as custodian for Rebecca Price in the total amount of $17,930.54, less $3,000.00 for a net conversion damage in favor of the plaintiff PPA Rebecca Price in the amount of $14,930.54.
 (4) Sums withdrawn from the plaintiff's CBT account for a net conversion damage in favor of the plaintiff in the amount of $42,514.50.
B. THE ISSUE OF EMBEZZLEMENT
In discussing embezzlement, the court in State v. Lizzi,199 Conn. 467 (1986), stated as follows:
 [E]mbezzlement is consummated where, as here, the defendant, by virtue of his agency or other confidential relationship, has been entrusted with the property of another and wrongfully converts it to his own use . . . .
The defendant makes the following argument regarding the embezzlement claim:
USES OF ACCOUNTS
Embezzlement is the wrongful CT Page 4645 appropriation to himself or another of property of another in his care or custody. C.G.S. 53a-119(1). Under the facts of this case, an embezzlement was not committed as to the plaintiff Pamela Price since there is no evidence that the defendant had any of the plaintiff's accounts in his care or custody. In fact, the evidence clearly showed that the plaintiff maintained custody and legal control of her stock accounts and her bank accounts at all times.
The court agrees with that argument regarding the plaintiff's CBT account because that account was never in the defendant's care or custody. The court is not persuaded by that argument regarding the plaintiff's Payson checks, the Payson checks issued on behalf of Jennifer Price, and the Payson checks issued on behalf of Rebecca Price. The receipt and appropriation of stock of another by the defendant for his own use with felonious intent to defraud constitutes embezzlement. State v. MacCullough, 115 Conn. 306 (1932). The court finds that all of the Payson checks were in the care and custody of the defendant. The court finds by clear and convincing evidence that the defendant has embezzled the following amounts:
 (1) Payson checks issued to the plaintiff individually, of which the defendant embezzled $38,014.91.
 (2) Payson checks issued on behalf of Jennifer Price of which the defendant embezzled $9,554.49.
 (3) Payson checks issued on behalf of Rebecca Price of which the defendant embezzled $14,930.54.
The court finds by clear and convincing evidence that the defendant used the proceeds from the Payson checks referred to in paragraphs (1), (2) and (3) above for his own use and the use of Alamap with felonious intent to defraud his wife and each of his two daughters.
The defendant, in addition to filing a general denial to all of the counts, has filed two special defenses. Those two special defenses allege as follows: CT Page 4646
FIRST SPECIAL DEFENSE TO ALL COUNTS
 1. Any actions taken by the Defendant were taken with the full authority or knowledge of the Plaintiffs and for the benefit of the plaintiffs.
SECOND SPECIAL DEFENSE TO ALL COUNTS
 1. The Plaintiff's causes of action are barred by operation of the Statute of Limitations C.G.S. 52-577.
The court finds that the defendant has failed to prove the allegations of the first special defense.
The second special defense raises the statute of limitations provided in 52-577. That statute of limitations provides as follows:
 Sec. 52-577. Action founded upon a tort. No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of.
The statute of limitations defense of 52-577 does not apply to the $42,514.50 withdrawn by the defendant from the plaintiff's CBT account, as all of those withdrawals took place less than three years from the time this action was commenced.
The plaintiff has filed a general denial to the first and second special defense raised by the defendant.
The plaintiff argues that the three-year statute of limitations of 52-577 does not apply for two reasons: (1) fraudulent concealment by the defendant, citing 52-595 C.G.S., and (2) continuing course of conduct. These claims will be considered seriatim.
(1) Fraudulent concealment under 52-595.
That statute provides as follows:
Sec. 52-595. Fraudulent concealment CT Page 4647 of cause of action. If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefore at the time when the person entitled to sue thereon first discovers its existence.
The plaintiff makes the following argument regarding52-595:
 Moreover, Connecticut General Statutes 52-595 states that a course of action shall accrue against one who fraudulently conceals the cause of action when the existence of the right to sue is first discovered.
 To toll the statute of limitations 52-595, the plaintiff must prove by clear and convincing evidence that (1) she was ignorant of the right of action against her husband; (2) that the defendant husband intentionally concealed the theft of the money; and (3) that there was a fiduciary relationship between the plaintiff and the defendant, her husband, or he was guilty of an affirmative act of concealment. Bound Brook Association v. Norwalk, 198 Conn. 660, 665-66 (1986) cert. denied, 479 U.S. 819 (1986).
The court is not persuaded by that argument.
As stated earlier, the plaintiff filed a general denial to the defendant's two special defenses. In discussing the procedure to raise the claim of fraudulent concealment, the court in Beckenstein v. Potter Carrier, Inc., 191 Conn. 150, 163
(1983), stated in part as follows:
 "In any event, this claim, even if it had any merit or basis, is not properly CT Page 4648 before this court. In order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it. D'Occhio v. Connecticut Real Estate Commission, 189 Conn. 162, 182-83, 455 A.2d 833 (1983); Rosenblatt v. Berman, 143 Conn. 31, 40, 119 A.2d 118 (1955). In the present case, the reply filed by the plaintiffs contained a general denial of the defense. This was insufficient. Id.
In discussing misappropriation of funds of another, the court in D'Occhio v. Connecticut Real Estate Commission,189 Conn. 162, 182-83 (1983), stated in part as follows:
 Section 20-324d is a limitations statute based on the accrual of a cause of action. "Applied to a cause of action, the term to accrue means to arrive; to commence; to come into existence; to become a present enforceable demand." Eising v. Andrews, 66 Conn. 58, 64, 33 A. 585 (1895). With certain exceptions not pertinent here, in cases involving the misappropriation of funds of another, the right of action will accrue at the time of the defalcation, State ex rel. McClure v. Northrup, 93 Conn. 558, 563, 106 A. 504
(1918); unless the statutory period is extended as a result of fraudulent concealment; General Statutes 52-595; in which case the cause of action will not accrue until its existence is discovered by the injured party. Eising v. Andrews, supra. Of course, for a plaintiff to rely on the fraudulent concealment statute it must be pleaded. Rosenblatt v. Berman, 143 Conn. 31, 39-40, 119 A.2d 118 (1955). (emphasis provided)
In this case the reply filed by the plaintiff was only a CT Page 4649 general denial which is not sufficient to raise the claim of fraudulent concealment under 52-595.
(2) Continuing course of conduct.
Both parties recognize the rule that when the conduct sued upon is a continuing course of conduct, the statute of limitations does not begin to run until the course of conduct is completed. Bartha v. Waterbury House Wrecking Co., 190 Conn. 8
(1983); Handler v. Remington Arms Co., 144 Conn. 316, 321 (1956); Vilcinskas v. Sears Roebuck Co., 144 Conn. 170, 174 (1956). In discussing the concept of continuing tortious conduct, the court in Schuster v. Buckley, 5 Conn. App. 473, 479 (1985), stated in part as follows:
 In order to toll the statute of limitations by reason of continuing tortious conduct, the plaintiff must allege in his complaint or present facts which reasonably support an inference of a continuing breach of duty by the defendant. Bartha v. Waterbury House Wrecking Co., supra, 13. (emphasis provided)
Bartha and Schuster stand for the proposition that it is not necessary to allege by way of special defense the claim of continuing tortious conduct in order to toll the statute of limitations as opposed to having to raise by special defense fraudulent concealment under 52-595.
In Fischera v. Mine Hill Corporation, 207 Conn. 204 (1988), the court at wages 209-210 reviewed a number of prior decisions involving a finding of a "continuing course of conduct" that may toll the statute of limitations. In reviewing those decision the court, at page 210, stated in part as follows:
 Where we have upheld a finding that a duty continued to exist after the cessation of the "act or omission" relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the CT Page 4650 prior act.
A) The issue of special relationship between the two daughters and the defendant.
In this case the defendant is the father of the two children. Rebecca A. Price is still a minor. Jennifer L. Price was born August 1970 and did not turn 18 until August of 1988. the funds for the two girl were to provide for their college education. He had agreed with the plaintiff to have those funds kept separate in the plaintiff's name. In discussing confidential relationships the court, in Worobey v. Sibieth, 136 Conn. 352,358-359 (1949), stated in part as follows:
 The claim of the plaintiff in this case is that she and the defendant were in a confidential relationship so that the real estate was subject to a constructive trust for her. She rests her case on our New York decisions: Wood v. Rabe, 96 N.Y. 414; Goldsmith v. Goldsmith, 145 N.Y. 313, 39 N.E. 1067; Harrington v. Schiller, 321 N.Y. 278, 132 N.E. 39; and Foreman v. Foreman, 251 N.Y. 237, 167 N.E. 428. In each of the first three of these cases, the transaction out of which a constructive trust was held to have arisen was one between a mother and her son or daughter; in the Wood case, it is said (p. 426): "It was a transaction between parent and child, a relation which, if not fiduciary in the strict sense, was nevertheless one ordinarily involving the greatest confidence on one side, and the greatest influence on the other."
 What relations between parties will be deemed by equity to be so confidential as to be a basis upon which it will raise a trust is, of course, impossible of definition. Analogies can be found in those cases where the relationship between the parties is such that the burden is upon the recipient of the CT Page 4651 property to prove the transaction to be fair and equitable. Where there is no proof of an actual confidential relationship and the law looks only to a presumption of fraud arising out of the relationship of the parties to each other, that relationship must be one where there is ordinarily a special trust and confidence and the likelihood of the exercise of personal influence and control such that one would expect of the other fair dealing and mutual consideration. (emphasis provided)
In discussing fiduciary relationships and the shifting of the burden of proof, the court in Alaimo v. Royer, 188 Conn. 36,41 (1982), stated in part as follows:
 This court has, however, specifically refused to define "a fiduciary relationship in precise detail and in such a manner as to exclude new situations," choosing instead to leave "the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." . . . Where such a relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. (emphasis provided)
In view of the promises that the defendant made to the plaintiff regarding the handling of his two daughters' funds, this court finds that there was a special relationship between the defendant and the two daughters, giving rise to a continuing duty. The plaintiff justifiably trusted the defendant to handle the college funds for the two daughters and the defendant exercised resulting superiority and influence.
B) Some later wrongful conduct of the defendant related to the prior act regarding the two daughters.
In this case the initial wrongful prior act of the defendant was in depositing Payson checks that had been made out to the CT Page 4652 plaintiff as custodian for the minor child Jennifer or Rebecca into a trustee account that he had set up for Jennifer or the trustee account that he had set up for Rebecca. The later wrongful conduct of the defendant related to that prior act was his conduct in withdrawing funds from Jennifer's trustee account and withdrawing funds from Rebecca's trustee account that were used either for his own purposes or were deposited into his Alamap account or for which there was no evidence as to what use was made of those funds. The date of the last transfer of funds from Jennifer's trustee account to the Alamap account was the transfer of $865.00 on June 3, 1988. The date of the last transfer of funds from Rebecca's trustee account to the Alamap account was the transfer of $250.00 on July 15, 1988. Therefore, the statute of limitations regarding Jennifer was tolled until June 3, 1988, and the statute of limitations regarding Rebecca was tolled until July 15, 1988. This action was brought within three years of June 3, 1988 and July 15, 1988.
The court further finds that there was a fiduciary relationship between the defendant and each of the two daughters as a result of which the burden of proving fair dealings shifted to the fiduciary defendant regarding the two daughters.)
C) The issue of a special relationship between the plaintiff and the defendant.
In discussing the relationship between husband and wife, the court in Billington v. Billington, 220 Conn. 212, 221 (1991), stated in part as follows:
 This principle of complete disclosure is consistent with the notion that "the settlement of a marital dissolution case is not like the settlement of an accident case. It stamps with finality the end of a marriage. `Marriage is a coming together for better or worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.' Griswold v. Connecticut, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510
CT Page 4653 (1965). Courts simply should not countenance either party to such a unique human relationship dealing with each other at arms' length. Whatever honesty there may, or should, have been during the marriage should at least be required by the court at its end." Grayson v. Grayson, supra, 299-300 (Borden, J., dissenting). . . .
 Finally, the principle of full and frank disclosure, with which the diligence limitation is inconsistent, is essential to our strong policy that the "private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine."
1. Payson checks issued to plaintiff individually.
This court does not find that the "special relationship between the parties" exists solely as a result of the marital relationship. This court does find that the marital relationship, coupled with the promises that the defendant made to the plaintiff regarding the handling of her funds, does constitute the special relationship giving rise to a continuing duty. The plaintiff justifiably trusted the defendant to handle her stock funds and the defendant exercised resulting superiority and influence. The court further finds that there was a fiduciary relationship between the defendant and the plaintiff as a result of which the burden of proving fair dealings shifted to the fiduciary defendant regarding the plaintiff's Payson checks.
In view of the promises that the defendant made to the plaintiff regarding the handling of her stocks and bonds, this court finds that there was a special relationship between the defendant and the plaintiff giving rise to a continuing duty. The plaintiff justifiably trusted the defendant to handle her stock funds and the defendant exercised resulting superiority and influence.
 2. The sale/purchase of Rhode Island/Madison home $71,607.54. CT Page 4654
The court finds that the marital relationship between the named plaintiff and the defendant does not constitute a "special relationship" between the parties in and of itself and therefore the three years statute of limitations involving the sale in 1983 is not tolled.
D) Some later wrongful conduct of the defendant related to the prior act regarding the plaintiff.
1. Payson checks issued to plaintiff individually.
In this case, the initial wrongful prior act of the defendant was in depositing Payson checks that had been made out to the plaintiff into his own account. The later wrongful conduct of the defendant related to that prior act was his conduct in withdrawing funds from his CBT account into which he deposited the Payson checks made payable to the plaintiff individually and using those withdrawals either for his own purposes, or depositing those withdrawals into his Alamap account, or for which there was no evidence as to what use was made of those withdrawals. On April 25, 1988 the defendant withdrew $605.00 from his CBT account and deposited that sum into the Alamap account. Plaintiff's Exhibit L also shows a withdrawal by the defendant from his CBT account on April 29, 1987 "to JTP checking" in the amounts of $1200.00 and $1500.00. therefore, the statute of limitations was tolled until April 29, 1987. This action was brought within three years of April 29, 1987. The court further finds that there was a fiduciary relationship between the defendant and the plaintiff, as a result of which the burden of proving fair dealings shifted to the fiduciary defendant regarding the plaintiff.
 2. The issue of some later wrongful conduct regarding the sale/purchase of Rhode Island/Madison, Connecticut house, $71,607.54.
The court finds that the plaintiff has not proven any later wrongful conduct by the defendant related to the sale proceeds of the Rhode Island property. The court, therefore, concludes that the plaintiff has failed to present facts which reasonably support an inference of a continuing breach of duty by the defendant relating to the sale of the Rhode Island property and therefore the statute of limitations bars the plaintiff's claim regarding that property. CT Page 4655
Counts XII and XIII of the amended complaint were added by the amended complaint dated April 7, 1992. One of the threshold issues is whether those two counts relate back to the date the original complaint was filed or whether, for the purposes of the statute of limitations, Counts XII and XIII are considered to have been brought on the date the request for leave to file the amended complaint was granted.
In discussing the Doctrine of Relation Back, the court in Sharp v. Mitchell, 209 Conn. 59, 71-72 (1988), stated in part as follows:
 "A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitled the plaintiff to relief. Bridgeport Hydraulic Co. v. Pearson, 139 Conn. 186, 197, 91 A.2d 778 [1952]; Veits v. Hartford, 134 Conn. 428, 434, 58 A.2d 389 [1948]. `A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action.' Pavelka v. St. Albert Society, 82 Conn. 146, 147, 72 A. 725 [1909]. A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action. Johnson v. Wheeler, 108 Conn. 484, 488, 143 A. 898 [1928]; Galvin v. Birch, 97 Conn. 388, 401, 116 A. 908
[1922]; O'Brien v. M P Theatres Corporation, 72 R.I. 289, 296, 50 A.2d 781
[1947]. It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but CT Page 4656 where an entirely new and different factual situation is presented, a new and different cause of action is stated.
The court finds that Counts XII sounding in fraud constitutes a new cause of action from Counts I through XI, and therefore, does not relate back to the date the original complaint was filed. Accordingly, the statute of limitations is complete defense to that count and that count is found in favor of the defendant.
Count XIII, on the other hand, sounds in breach of fiduciary duty. To that extent it is similar to Count II. It, therefore, is not a new cause of action, and relates back to the date the original complaint was filed. Further, the statute of limitations does not apply to Count XIII.
Count XIII sounds in breach of fiduciary duty. In discussing the statutes of limitations as it relates to breach of fiduciary duty, the court in McDonald v. Hartford Trust Co.,104 Conn. 169, 188-189, stated in part as follows:
 If the relation between the plaintiff and her husband as to these funds be held to be that of principal and agent, instead of trustee and cestui que trust, it was in that class of agencies whose obligations were wholly fiduciary in character. . . . Neither the statute of limitations, nor lapse of time, is a bar to the maintenance of this action. The claim, whether arising out of an express trust or the relation of principal and agent, or whether the remedy be to impress a trust, or for an accounting, or a claim for damages, was from its nature an equitable claim, and the remedies sought in this action are all equitable remedies. Against them the statute of limitations does not run so long as either the trust or the fiduciary relationship exists. (emphasis provided)
The court finds in this case that the fiduciary relationship CT Page 4657 between the parties continued until July 1988 when the plaintiff first became aware of the missing funds. The court, therefore, concludes that there is no basis for the claim that the statute of limitations applies to the Payson check claims of the plaintiffs. The court further finds that laches does not exist in this case.
The remaining issues involve the plaintiff's claim for double damages under 52-565 and treble damages under 52-564. These claims will be considered seriatim.
1. The claim for double damages.
Section 52-565 provides as follows:
 Sec. 52-565. Double damages for forgery. Any person who falsely makes, alters, forges or counterfeits any document, or knowingly utters, as true, any document falsely made, altered, forged or counterfeited, shall pay double damages to any party injured thereby.
The court finds that the plaintiff has failed to prove that the defendant committed forgery or counterfeited any documents and therefore the claim for double damages under 52-565 is denied.
2. The claim for treble damages under 52-564.
Section 52-564 provides as follows:
 Sec. 52-564. Treble damages for theft. Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages.
In discussing the question of when there can be a finding that a defendant did steal the property of the plaintiff, the court in Lauder v. Peck, 11 Conn. App. 161, 164-165 (1987), stated in part as follows:
The defendant next claims that the CT Page 4658 court erred in finding that the defendant violated General Statutes 52-564; see footnote 2, supra; because the defendant did not steal the defendant's property or knowingly receive and conceal stolen property. We disagree.
 The defendant claims that the finding by the court that he committed a "larceny," in violation of General Statutes 53a-119, of the plaintiff's property does not support a conclusion that the defendant "stole" the plaintiff's property, within the meaning of General Statutes 52-564. See footnote 2, supra. This claim is without merit.
 The word "steals" as used in General Statutes 52-564 is synonymous with the definition of larceny under General Statutes 53a-119. (emphasis provided)
In this case the claim of the plaintiff is that the defendant committed embezzlement. The larceny definition under53a-119 includes embezzlement defined as follows:
 (1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody.
This court has already found that defendant committed embezzlement. This court, therefore, concludes that the defendant did steal the property of the named plaintiff and of her two daughters.
In discussing the standard of proof required to support an award of treble damages pursuant to 52-564, the court, in Schaffer v. Lindy, 8 Conn. App. 96, 104-105, stated in part as follows:
The defendant's final claim relates CT Page 4659 to the standard of proof required to support an award of treble damages pursuant to General Statutes 52-564. It is clear that an award of treble damages is an extraordinary statutory remedy. Also, when treble damages are sought pursuant to 52-564, the plaintiff is not required to prove his case beyond a reasonable doubt. Generally, facts which constitute a crime need not be proven beyond a reasonable doubt if they are at issue in a civil action. It is ordinarily sufficient in civil cases to prove the existence of the criminal act by a preponderance of the evidence. "However, clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, as where this high standard is required to sustain claims which have serious consequences or harsh or far-reaching effects on individuals, to prove willful, wrongful and unlawful acts, to justify an exceptional judicial remedy, or to circumvent established legal safeguards. . . ." We conclude, therefore, that clear and convincing proof of the actions alleged is required in order to assess treble damages pursuant to 52-564. (Citations omitted) (emphasis provided)
This court has used the standard of clear and convincing proof in order to assess treble damages pursuant to 52-564 and finds by clear and convincing proof that the defendant stole the following amounts:
 (1) Payson checks issued to the plaintiff individually, of which the defendant embezzled $38,014.91.
 (2) Payson checks issued on behalf of Jennifer Price of which the defendant embezzled $9,554.49. CT Page 4660
 (3) Payson checks issued on behalf of Rebecca Price of which the defendant embezzled $14,930.54.
The court, therefore, awards treble damages to the plaintiff individually against the defendant in the amount of $114,044.73 plus $42,514.50 for sums converted by the defendant from the plaintiff's CBT account. The court awards treble damages to the plaintiff Jennifer Price against the defendant in the amount of $28,663.47. The court awards treble damages to the plaintiff PPA Rebecca Price against the defendant in the amount of $44,791.62.
The final claim of the plaintiff is for punitive damages including costs. In discussing the issue of punitive damages, the court, in Alaimo v. Royer, 188 Conn. 36, 42 (1982), stated in part as follows:
 This court has recently restated our long-standing rules governing the award of punitive damages: "Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights . . . . If awarded, they are restricted to cost of litigation less taxable costs of the action being tried and not that of any former trial . . . . Further, for an award of punitive damages it is essential that evidence of the cost of the litigation of the case being tried must be offered."
In this case evidence was introduced that the cost of litigation would be one-third of the total amount of the award. There was further evidence introduced that court costs totalled $750.00.
The court finds that the evidence in this case shows a reckless indifference by the defendant to the rights of the plaintiffs and an intentional and wanton violation of those rights. This finding is made based on clear and convincing evidence. The court, therefore, awards punitive damages as follows:
1. $38,014.91 is awarded to the plaintiff individually CT Page 4661 against the defendant as punitive damages;
2. $9,554.49 is awarded to the plaintiff Jennifer Price against the defendant as punitive damages;
3. $14,930.54 is awarded to the plaintiff PPA Rebecca Price against the defendant as punitive damages.
In addition, the sum of $750.00 is awarded against the defendant as court costs to be divided equally between the three plaintiffs.
Sidney Axelrod, Judge